**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DUSTIN GROWICK | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| EMILY ANN MEURER a/k/a | ) | Jury Trial Demanded |
| EM MEURER | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Dustin Growick, by and through his attorneys Elvis Gonzalez Ltd. and Nesenoff & Miltenberg, LLP, as and for his complaint against Defendant Emily Ann a/k/a "Em" Meurer, alleges as follows:

### NATURE OF THE ACTION

1.      This action arises from a relentless, false and defamatory smear campaign launched by Defendant Emily Ann ("Em") Meurer ("Defendant") against Plaintiff Dustin Growick ("Plaintiff") through which Defendant admittedly sought to destroy Plaintiff's reputation and career.

2.      Prior to Defendant's false and destructive smear campaign, Plaintiff was a popular science communicator, author and social media influencer who was well known for his children's books on dinosaurs, engaging and entertaining shows and museum tours aimed at adult audiences, and unique approach to science education, including all things related to dinosaurs.

3.      Defendant intentionally and maliciously spread horrific and disturbing lies about Plaintiff, including false accusations of "grooming," drugging her, sexual coercion, sexual assault

1

and that he was a sexual predator who was not safe around children. She also falsely accused him of stealing her work without giving her credit.

4.     Defendant, who became acquainted with Plaintiff through one of his online science shows, saw Defendant in person only six (6) times in public or group settings over the course of 2.5 years.

5.     The parties never engaged in physical intimacy nor had a romantic relationship.

6.     Defendant's text messages with Plaintiff contradict her false statements.

7.     Defendant had absolutely no basis for even suggesting that children were unsafe around him.

8.     Defendant spun a false narrative in which she infantilized herself and adult women in their twenties, likening them to children.

9.     Defendant provided no research or other materials that Plaintiff could have relied on in writing any of his books, never read any pitch materials or manuscripts for Plaintiff's books and had absolutely no basis to accuse him of stealing her "work."

10.     Defendant's false and defamatory accusations were extremely damaging to Plaintiff because they were made in connection with a children's book written by Plaintiff on the eve of its publication.

11.     Defendant also relied on a false, sexual assault narrative to torpedo an adult book that Plaintiff was writing about dinosaurs.

12.     She published the false accusations on social media, in direct messages and other communications to Plaintiff's friends, and in direct communications with Plaintiff's literary agent and book publishers.

13.     Consequently, Plaintiff was canceled and the career and companies that he spent nearly two decades building came to an abrupt end. Once popular and well liked, Plaintiff is *persona non grata* in the science community. A Google search for "Dustin Growick" reveals posts about Plaintiff being cancelled.

14.     Plaintiff lost his agent and book deals, his books were never published, he had to close his social media accounts, his science show and appearances were cancelled and he has been unable to work.

15.     As a result of Defendant's false and defamatory smear campaign, intentionally designed to "cancel" Plaintiff and ruin his life, Plaintiff has suffered damages in an amount to be determined at trial but not less than $1 million, including reputational harm, lost business opportunities, lost publishing contracts, book royalties and licensing/merchandising fees, cancelled appearances, lost future earning capacity and emotional distress.

16.     Plaintiff is also entitled to punitive damages because, as detailed below, at the time Defendant published false and defamatory statements about Plaintiff she knew those statements were false or acted with reckless disregard as to the truth or falsity of her statements.

## THE PARTIES

17.     Plaintiff is a natural person who is domiciled in, and a citizen of, Ohio.

18.     Defendant is a natural person who is domiciled in, and a citizen of, Illinois.

## JURISDICTION AND VENUE

19.     The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states and the amount in controversy exceeds $75,000.

3

20.     The Court has personal jurisdiction over Defendant Meurer because she is a resident of Illinois.

21.     Venue is proper in this District because Defendant Meurer resides in this District.

### FACTS RELEVANT TO ALL CLAIMS

**I.      Plaintiff's Unique Approach To Science-Based Entertainment**

22.     Plaintiff is a trained anthropologist, with a Master's degree in Socio-Cultural Anthropology.

23.     He was a social media influencer and author who was widely known for his knowledge and expertise about—and love of—dinosaurs.

24.     More significantly, Plaintiff used his love of dinosaurs to entertain and garner the interest of children and adults in dinosaurs and science.

25.     Plaintiff started his career as a facilitator of educational programs for highly regarded and well-known museums and developed several successful business models from that point forward, until people and institutions stopped working with him in March 2024 as a result of the Defendant's false and defamatory accusations against him, which are detailed below.

26.     In 2014, Plaintiff helped to create a museum tour business that focused on one-of-a-kind adult museum adventures that combined humor, wit and sarcasm with an educational approach to the museum experience. Plaintiff was responsible for designing science-based programming for the company and led the consulting arm of the business, which provided professional development training to museums.

27.     The business became a top-rated attraction. As a result, Plaintiff began training and coaching museum staff, facilitating professional development, leading interactive tours and emceeing events at cultural institutions and museum conferences around the globe.

28. During the Pandemic,[1] Plaintiff wrote and produced a popular, interactive Zoom show, "DINO 101." The show included interviews with scientists, interactive challenges and scavenger hunts. It started as a free show for all ages and then Atlas Obscura partnered with Plaintiff to produce a ticketed, adults-only show on a weekly basis.

29. Post-pandemic, DINO 101 morphed into SCIENCE 101, a live interactive science game show which Plaintiff hosted at venues in New York City, Boston, Raleigh and Houston.

30. From 2019 through March 2024, Plaintiff also ran his own museum consulting company, collaborating with cultural institutions across the globe on professional development on audience engagement, storytelling and interactive programming.

31. During the course of his career, Plaintiff also volunteered his time with a nonprofit organization, educating students at the K-12 level about dinosaurs and science.

32. A core theme throughout Plaintiff's work was to give a platform to early career scientists and others in the STEM[2] field who are part of historically underrecognized groups. The purpose of this was to make the best and most inclusive entertainment and learning environment, and to encourage participation from new audiences that might not otherwise see themselves fairly represented in STEM.

33. As Plaintiff's career progressed, he developed quite the following on Instagram (50,000 followers) and Twitter ("X") (25,000 followers), and also had a popular YouTube channel. Plaintiff's social media accounts were a key method of marketing and publicizing Plaintiff's business pursuits, making connections and reaching target audiences for his tours, shows and books

---

[1] The Covid-19 pandemic that severely impacted the United States beginning in March 2020 is referenced herein as the "Pandemic."
[2] STEM stands for Science, Technology, Engineering and Mathematics.

5

that he authored. Plaintiff further used social media to network with scientists and other collaborators for his projects and theirs.

## II.    Plaintiff's Publishing Career

34.    Plaintiff published two books and was set to publish two more at the time that the Defendant embarked on a false and defamatory smear campaign against him.

35.    In 2016, Plaintiff's first children's book about dinosaurs was published by a Big Five publisher.

36.    In 2017, Plaintiff published a second children's book about dinosaurs, through the same publishing company.

37.    Plaintiff's third book, a children's guide to touring natural history museums, was scheduled for publication by a Big Five publisher in July 2024.

38.    The publisher pulled the book after direct contact from the Defendant in which she falsely accused Plaintiff of sexual assault and sexual harassment. The publisher further made an announcement on its Twitter ("X") account that the book was cancelled, which Defendant posted to her Twitter ("X") account with a thank you note.

39.    In February 2024, Plaintiff signed a contract with a Big Five publisher to publish a witty, educational dinosaur book for adults only, with accompanying merchandise and guides, in the United States. He also signed a contract to publish the book in Germany. These contracts were cancelled as a result of Defendant directly contacting the U.S. publisher and falsely accusing Plaintiff of sexual assault.

40.    A major consideration of the publishers of Plaintiff's latter two books was his sizeable following on Instagram, Twitter ("X") and YouTube. This indicated that people enjoyed

and engaged with Plaintiff's educational style. It also demonstrated that Plaintiff had a built-in marketing and publicity tool to reach target audiences.

### III. Plaintiff's Sporadic In-Person Interactions With Defendant

41.     Plaintiff and Defendant were acquainted for approximately two and a half (2.5) years, with almost all of their communications happening on Zoom or via an occasional text message. Their text communications focused primarily on DINO 101 and SCIENCE 101, and they had occasional conversations about their employment.

42.     During the 2.5 years that they were in contact, the parties saw each other in person six (6) times, all of which involved either meeting in public or in a group with other people present.

43.     While the parties occasionally sent each other flirtatious messages, the two never had a sexual relationship.

44.     At no point in time was Plaintiff involved in a romantic or intimate relationship with the Defendant.

45.     Plaintiff did not have sexual contact with the Defendant.

46.     The two did not have sexual intercourse.

47.     At no point in time did Plaintiff ask Defendant if she wanted to be sexually or romantically involved, nor did he remotely suggest it.

48.     Plaintiff first met the Defendant online at the beginning of the Pandemic, when she attended his DINO 101 show on Zoom.

49.     At the time, both parties were residing in Ohio.

50.     On May 15, 2020, Defendant and her friend drove from Cincinnati to Columbus to meet Plaintiff in person and the three had lunch.

51.     Plaintiff saw Defendant in person again about nine months later, on February 20, 2021, when she was in Columbus, Ohio and the two took a walk around the park near Plaintiff's residence. Defendant told people in the parties' social group that she viewed this visit as a date. When Plaintiff learned of this from the group, he emphasized that it was not a date.

52.     Plaintiff next saw Defendant in person approximately eight months later, when Defendant visited New York City on or about October 8-October 10, 2021. During the visit, Plaintiff and Defendant participated in group activities, namely a group lunch on the rooftop at Sotheby's and a group visit to the American Museum of Natural History. Defendant was also a guest participant in Plaintiff's SCIENCE 101 show.

53.     Eight months later, on June 10, 2022, Defendant and her sister attended Plaintiff's live SCIENCE 101 show in New York City.

54.     After the show, a group of people including Plaintiff, Defendant and Defendant's sister went out to a bar.

55.     By her own admission in a text message the next day, Defendant and her sister made an "Irish Exit," meaning they left the bar without saying goodbye. The text messages in question are attached hereto as Exhibit 1.

56.     On August 5, 2022, in a text exchange initiated by Defendant, she referred to Plaintiff as a "good friend." The text exchange is attached hereto as Exhibit 2.

57.     On September 7, 2022, Defendant texted Plaintiff and asked him if he ever modeled for stock photography. She then sent him a photo of a cover from a romance novel featuring a shirtless, muscular male, stating "I SWEAR this on book my friend told me to read looks like you." Plaintiff sent back a goofy photo of himself with his shirt on. A copy of this text exchange is attached hereto as Exhibit 3.

8

58.     The two planned to visit with each other in Chicago in October 2022 but the plan fell through due to a change in Plaintiff's travel plans. Defendant, who had a roommate at the time, even offered to let Plaintiff stay in their guest room.

59.     Plaintiff did not see or hear from the Defendant after he cancelled his visit to Chicago on October 24, 2022.

60.     On September 12, 2023, Plaintiff texted Defendant a mockup of a page of his children's book about natural history museums, which included a fictional character named Em. The page also included Jimi, who was named after a DINO 101 participant, and Jon, who was named after Plaintiff's best friend.

61.     Several characters in the book were named after people that Plaintiff was friendly with, both personally and professionally, including people whom he had met through DINO 101.

62.     The book did not contain any of Defendant's research, ideas or work.

63.     Defendant did not respond to the text.

**IV.     The Parties' "Working" Relationship**

64.     After becoming acquainted during the Pandemic via DINO 101, the parties supported each other professionally.

65.     During the time in which Plaintiff was hosting DINO 101 on Zoom, Defendant had a few bit parts on the show, on a volunteer basis. More specifically Defendant was involved in a portion of the show called "The Whiteboard Challenge."

66.     Once Atlas Obscura partnered with DINO 101, and the show was generating an income stream, Plaintiff paid Defendant for the time she spent on "The Whiteboard Challenge."

67.     When DINO 101 became an adults only show, Defendant was a featured speaker about her love of romance novels concerning intimate relationships between dinosaurs or "monsters" and people.

68.     Defendant was one of a handful of people to have a consistent, recurring role on DINO 101.

69.     On one occasion, Defendant appeared on DINO 101 to talk about her interest in the genre of dinosaur (and other "monster") romance novels, which depict intimate relationships between dinosaurs (or monsters) and humans.

70.     Defendant also drew some dinosaur and animal "mashups" for DINO 101, one of which Plaintiff shared on his social media accounts, giving Defendant full credit and tagging her.

71.     When DINO 101 became SCIENCE 101, Plaintiff and the co-host of the show also hired Defendant to design the SCIENCE 101 show poster, for which she was paid.

72.     In April 2021, Defendant informed Plaintiff that she was applying for a job at a well-known museum (where Plaintiff had previously worked).

73.     She asked Plaintiff for guidance on her cover letter, his assistance with a connection he had at the museum and if he would be a reference for her based on her participation in DINO 101. Plaintiff happily obliged. Subsequently, Defendant used Plaintiff as a professional reference on a number of occasions.

74.     In April 2022, Defendant told Plaintiff about a job opportunity with her employer, noting that she would get paid a referral fee if he got the job. Plaintiff did not ultimately interview for the job.

**V.    Defendant Sets Out To Destroy Plaintiff's Reputation And Career With False Accusations**

**A. The False and Defamatory February 21, 2024 Instagram Stories**

75.    On February 21, 2024, having learned that Plaintiff had a book coming out about touring natural history museums, Defendant posted a picture of the book cover (including Plaintiff's name) to her Instagram story. She tagged Plaintiff's publisher and asserted the following false accusations:

a.    "this white man … is known for co-opting work among the scicomm crowd"

b.    "this … guy stole work from me (worked collaboratively and then removed all credit)." A copy of the Instagram story is attached hereto as Exhibit 4.

76.    These statements are defamatory *per se* and not capable of an innocent construction because they accuse Plaintiff of stealing other's work and presenting it as his own in his soon-to-be-published book.

77.    The above two statements are false and Defendant knew they were false at the time she made them or, at the very least, Defendant acted in reckless disregard of the truth or falsity of the statements above.

78.    Plaintiff and Defendant did not discuss his museum book, nor did Plaintiff ask Defendant to contribute any research, writing, drawings or other material to that book.

79.    Plaintiff did not share a manuscript, pitch materials or research materials for his museum book with Defendant, nor had the book been published at the time of Defendant's Instagram post.

80.    Having never read the book, it is apparent that Plaintiff had no evidence that Defendant had stolen her work—or the work of others—or failed to credit anyone, as falsely asserted in the post.

81.     Plaintiff and Defendant did not collaborate on any book written by Plaintiff.

82.     Plaintiff did not promise to give Defendant any credit for all or any part of his museum book because no credit was due.

83.     Nor can Defendant credibly claim that Plaintiff failed to give her credit in his adult guide to dinosaurs.

84.     Defendant learned about the book on January 18, 2022, in a text exchange in which Plaintiff asked Defendant how she would rate a dinosaur's "sexiness." Plaintiff told Defendant that he was writing a dinosaur guide book for adults. Defendant told Plaintiff she was "4 seconds away" from writing an essay about her ratings of dinosaur sexiness and she had done a lot of research "for secret funsies" about "niche romance writing and sexual selection." She demanded that she receive credit for her brief text response. A copy of this text exchange is attached hereto as Exhibit 5.

85.     Nothing shared in this text message was included in the adult guide to dinosaurs.

86.     Plaintiff never gave Defendant a copy of any manuscript, pitch materials or research materials from his adult guide to dinosaurs.

87.     The book was never published and, accordingly, could not have been reviewed by Defendant to determine whether her work was part of it.

88.     The book had nothing to do with niche romance writing.

89.     "Sexual selection" is not a concept specific to Defendant's research or any hypothesis she came up with. It is a common scientific concept that Plaintiff studied in graduate school. It is based on visual clues about a potential mate's genetic fitness and ability to provide for offspring.

90.     In any event, nothing that Defendant shared with Plaintiff at any time, was the basis of, or part of, Plaintiff's book.

91.     Having not seen or read Plaintiff's adult guide to dinosaurs, Defendant could not have truthfully asserted that Plaintiff stole her work and used it in that book.

92.     On January 18, 2022—the same day that Defendant learned about Plaintiff's adult guide to dinosaurs—Defendant messaged her friend:

> Guess who is writing a book based on Dinosaur 101 and is absolutely stealing my weird personal research about sexual selection and the popularity [of] monsterfucker porn
>
> …
>
> I told him he better personally credit me with that like 3 minutes after sending
>
> …
>
> Honestly if the whole acknowledgments section isn't a shrine to us, I'm ending Dustin's career God I want to tweet that so bad.

A copy of this message is attached hereto as Exhibit 6.

93.     On January 19, 2022, Defendant also messaged the same friend and told her that Plaintiff had expressed concern that he would "do something shitty" and "basically lose his career" like another science communicator who had been accused of raping a woman. This was false. The friend responded "I don't think he's going to rape anyone." A copy of this message is attached hereto as Exhibit 7.[3]

94.     Even more disturbing than Defendant falsely accusing Plaintiff of stealing her work, the February 21, 2024 Instagram post falsely accused Plaintiff of sexual assault and implied that he was a pedophile, stating:

> this is the guy [who] … groomed me and many other young women trying to get into scicomm and tried to coerce me into sleeping with him… I do not trust him as a person, let alone as someone who should be doing work for/around kids.

Exhibit 4.

95.     These statements are defamatory *per se* and not capable of an innocent construction because they accuse Plaintiff of being a sexual predator and pedophile.

---

[3] The identity of the person accused of rape has been redacted from the message.

96.     Plaintiff did not "groom" Defendant, who was approximately 28 years old when she made the Instagram post. Nor has he "groomed" any other person—adult or child—in his life. This statement is absolutely false and preposterous. Plaintiff has never even been alone in a room with Defendant.

97.     "Grooming" is a common tool used by individuals who sexually abuse children, defined as manipulative behaviors that the abuser uses to gain access to a potential victim, coerce them into agreeing to the abuse, and reduce the risk of being caught. These tactics are used most often against children.[4] Grooming includes targeting a victim, gaining trust to keep secrets, physically and emotionally isolating the victim, and using seemingly harmless physical behaviors, such as wrestling or tickling, as a gateway to sexual assault.

98.     Given that Plaintiff saw Defendant in person on six (6) occasions—in a public or group setting—over the course of 2.5 years, he never had a sexual relationship with Defendant, and engaged in sporadic text messages with the Defendant which were predominantly about DINO 101 and SCIENCE 101, Defendant clearly could not have believed that she was groomed when she made the Instagram post in February 2024.

99.     Defendant's statement that Plaintiff tried to coerce her into sleeping with him is also false.

100.    There was simply no power for Plaintiff to leverage in order to "coerce" anything from Defendant. Defendant had her own design career during the time in which she participated in Plaintiff's show, Plaintiff made no promises to her which were not kept, and Defendant routinely relied on Plaintiff as a reference and used his connections when she was looking to leave her

---

[4] RAINN, *Sexual Assault: Grooming: Know The Warning Signs*, https://rainn.org/news/grooming-know-warning-signs (last visited on February 4, 2025).

position at a design firm. No aspect of Defendant's life or career hinged on any action taken by Plaintiff.

101. For the reasons set forth in Paragraphs 41-59, 71-74, Defendant knew that this statement was false at the time that she made the February 2021 Instagram post.

102. Most horrendous is Defendant's assertion that Plaintiff is not to be trusted around children. Particularly since Plaintiff had been working with children as a classroom teacher and in museum education for nearly two decades.

103. Defendant had absolutely no basis for this patently false statement which was intended to derail Plaintiff's career, including his publication of the upcoming museum guide for children that was featured in Defendant's Instagram post. Defendant's intent to destroy Plaintiff was clearly stated in messages to her friend in January 2022. Ex. 6.

104. She knew that her statement was false at the time she posted it.

105. Defendant had observed Plaintiff with other adults, parents and children on DINO 101, when it started out as an all-ages show at the beginning of the Pandemic.

106. At no point did Plaintiff engage in any inappropriate or remotely questionable behavior during that time—or when DINO 101 became a show for adults only (or at any other point in his life).

107. All episodes of DINO 101 are still available on YouTube and demonstrate that Defendant had no basis for her false and defamatory assertions about Plaintiff's actions around children.

108. Defendant's February 21, 2024 Instagram post also made the following false statement about Plaintiff:

> This author once told me that he's afraid of being accused of SA and losing all credibility—no one says that out of the blue.

Exhibit 4.

109. This statement is defamatory *per se* and not capable of an innocent construction because the phrase "no one says that out of the blue" accuses Plaintiff of being guilty of sexual assault.

110. This statement is false because Plaintiff did not make any such statement "out of the blue."

111. Defendant knew that her statement was false at the time she made it because she deliberately mischaracterized a conversation she had with Plaintiff about the impact of being accused of sexual assault after #MeToo, even when the accusations are false. Two years earlier, Defendant's friend found her accusations to be lacking in credibility. Ex. 7.

112. Over ***two years*** prior to Defendant's Instagram post, at the group lunch at Sotheby's, there was a conversation about the #MeToo movement and unproven allegations of sexual assault. At that time, Plaintiff expressed how difficult it would be for a man, including himself, to face false accusations which can ruin one's life, even though there is no evidence to support them. Plaintiff did not start the conversation, did not express concern about being found guilty of sexual assault and it was not brought up out of the blue.

**B. Defendant Contacts Plaintiff's Agent and Book Publishers**

113. On March 26, 2024, Defendant contacted: i) the publisher of Plaintiff's children's guide to museums; ii) the publisher of Plaintiff's adult guide to dinosaurs and iii) Plaintiff's agent and falsely accused him of stealing her work, "grooming" her and sexual assault. Attached hereto as Exhibit 8 is a copy of the letter to Plaintiff's agent.

114. Defendant made the following false and defamatory statement about Plaintiff to his publishers and agent:

Plaintiff was "using work that we created collaboratively without credit."

As discussed *supra* Paragraphs 78-93, this statement is false, was made with actual malice and is incapable of an innocent construction.

115. Defendant made the following false and defamatory statement about Plaintiff to his publishers and agent:

Defendant had a "serious concern" of "our friendship turning into a grooming situation, when he discussed wanting to have sex with me to some of our mutual friends and put me into uncomfortable situations with him where it was clear he was intending to do just that."

Ex. 8. As set forth *supra* Paragraphs 41-59, 71-74, this statement is false, was made with actual malice and is not capable of an innocent construction. Notably, Defendant varied her statement in this instance to a concern that the relationship would "turn into" a grooming situation. Given that Plaintiff and Defendant did not spend any time alone together and did not engage in any form of physical intimacy, Defendant knew she was making a false statement when she stated that it was clear Plaintiff "was intending" to have sex with her.

116. Defendant made the following false and defamatory statement about Plaintiff to his publishers and agent:

The experience really boils down to a conversation that I had with him where he told me that his biggest fear is that he will be publicly accused of sexual assault and lose his internet credibility—no one says that in innocence or out of the blue.

Ex. 8. As discussed *supra* Paragraphs 109-112, this statement is false and Defendant deliberately mischaracterized a conversation that a group of friends had about the #MeToo movement in order to bolster her false allegations of sexual misconduct.

117.     Defendant made the following false and defamatory statement about Plaintiff to his publishers and agent:

"Dustin has continually shown a pattern of sexual harassment that is focused on, but not limited to, very young women."

Ex. 8.

118.     The above statement is false.

119.     The above statement is defamatory *per se* and is incapable of an innocent construction.

120.     Defendant had no basis for asserting that Plaintiff engaged in a "pattern of sexual harassment" because she saw Defendant in person on only six (6) occasions in social settings over the course of 2.5 years.

121.     Defendant did not identify the purportedly "very young women" that were allegedly harassed. To the extent Defendant relied on allegations shared with her by other people, Defendant actively sought out negative information from unreliable and biased sources and, at the very least, acted with reckless disregard for the truth. Her use of the phrase "very young women" was also inflammatory, belying her ill will towards Plaintiff.

122.     Defendant went so far as to inform Plaintiff's publishers and agent that "allowing him to be shown to a young audience as a trustworthy figure does not sit right with me, given my experiences with him." Ex. 8.

123.     Defendant had no "experiences" with Plaintiff, nor did she ever observe him interacting inappropriately with children or minors.

124.     As a result of Defendant's false and defamatory statements, Plaintiff's publishers dropped him, his publishing contracts were cancelled and neither his children's guide to museums

nor his adult guide to dinosaurs were published as planned. Plaintiff's agent also removed Plaintiff from the list of authors on its website.

125. On April 2, 2024, the publisher of Plaintiff's children's book posted the following to its Twitter/X account:

> We support the rights of all survivors to speak about their experiences without fear. In light of these very serious allegations, [we] will not be moving forward with the publication of this book.

As of January 31, 2025, the post was viewed 7,171 times. Defendant reposted this post to her Twitter/X account.

126. After reposting the Tweet, Defendant published a post that thanked the publisher for "taking the time to listen to concerns about one of their authors and pulling publication" of Plaintiff's book. As of January 31, 2025, this post was viewed 1,321 times.

### C. Defendant's March 26, 2024 and April 2, 2024 Instagram Stories Evidence Defendant's Primary Goal: Destroy Plaintiff's Career

127. On March 26, 2024, Defendant posted a series of stories on Instagram which named Plaintiff and undermined Defendant's credibility. She sought information about Plaintiff from other "victims" including whether Plaintiff "hit on" them, tried to "sleep with" them or tried to get them to "connect him with someone." A copy of Defendant's Instagram stories is attached as Exhibit 9.

128. Hitting on someone, asking a person to have sex and connecting people to each other does not constitute sexual misconduct. Defendant's post draws no distinction between human behavior that is welcome or consensual and sexual harassment or sexual assault. It also conflates sexual harassment and sexual assault.

129. This story was also defamatory because it asked:

"Do you know Dustin Growick? Did he ever ***harass [or] assault … you***?"

Ex. 9

130.    The statement that Plaintiff sexually harassed people is false.

131.    The statement that Plaintiff sexually assaulted people is false.

132.    Defendant's Instagram story further stated:

After finally coming to terms with it, I realized **that I couldn't be the only person he has done this to.**

Ex. 9.

133.    Viewed in its entire context, this statement is defamatory *per se* because it accuses Plaintiff of sexually harassing or assaulting the Defendant. It is not capable of an innocent construction.

134.    At the very least, it is defamatory because Defendant's Instagram followers would know what Defendant was referring to from previous posts.

135.    As discussed at Paragraphs 41-59, 71-74, Defendant's statements were false and she knew they were false at the time she made them.

136.    On the same day, Defendant posted a story which stated:

Told my mom I connected with another victim of fucking Dustin's shithead behavior, and she just asked when I was gonna let it go.

Exhibit 9. In the story, Defendant is flashing the peace sign and smiling.

137.    By her own admission, Defendant's mother, did not seem to believe the allegations. Despite her own mother's skepticism, Defendant continued to escalate her attack.

138.    On the same day, Defendant also posted that she had purportedly connected with two other "victims" and that she was "collecting stories to take back to [Plaintiff's] publishers to request that they pull his forthcoming books." Exhibit 9. She was seeking information about "bad encounters" with Plaintiff.

20

139. Defendant did not identify the purported victims in the story but Plaintiff has not engaged in any form of sexual misconduct.

140. To the extent that Defendant spoke to any other individuals who accused Plaintiff of any form of sexual misconduct, those accusations are false.

141. Given that Defendant was soliciting negative information about Plaintiff in order to destroy his publishing career—which was clearly stated in her Instagram stories—any persons that came forward would also be biased and unreliable and, at the very least, Defendant acted in reckless disregard of the truth when publishing statements about the other "victims."

142. Defendant perpetuated her false and defamatory narrative by publicly pressuring Plaintiff's publishers to cancel Plaintiff's books without regard to the identities of Plaintiff's purported accusers. This appeared on Defendant's Instagram story on or about March 26, 2024.

143. As a result of Defendant's false and defamatory social media campaign against Plaintiff, he immediately shut down his Instagram and Twitter/X accounts, which were a key component of his business and essential to publishers as well.

144. On April 2, 2024, Defendant published a copy of a post from her Twitter/X account to her Instagram stories, thanking Plaintiff's publisher for "pulling" Plaintiff's children's guide to natural history museums. Ex. 9; attached hereto as Exhibit 10, is a copy of Defendant's Twitter/X post from April 2, 2024.

145. On or about the same day, Defendant also rejoiced at the news that the publisher of Plaintiff's adult guide to dinosaurs "IS GETTING THEIR LAWYERS TO START DISSOLVING HIS CONTRACT HOLY SHIT." Ex. 9.

146. Defendant's Instagram stories are a further reflection of her desire to destroy Plaintiff's career due to her misbelief that she should have received an acknowledgment for her

21

participation in DINO 101 (which she did) and in Plaintiff's books (which she had not even read). Her goal was to stop the publication of his books.

### D. Defendant's False and Defamatory Statements To Plaintiff's Friend

147.    On or about March 26, 2024, Defendant sent direct messages to a close female friend of Plaintiff's friend which contained the following false and defamatory statement:

> "we hung out and [Plaintiff] told me he has a really big fear of being accused of sexual assault and losing everything, which was a really really big red flag for me because NO ONE JUST SAYS THAT???"

A copy of these messages is Attached as Exhibit 11.

148.    As discussed *supra* Paragraphs 109-112, this statement is false, defamatory per se and was made with actual malice.

149.    Defendant next suggested that Plaintiff drugged her when they last saw each other in person:

> "The last time I saw him, I didn't have a lot to drink, but I blacked out, and that really feels like a weird coincidence that has never sat right with me."

Exhibit 11.

150.    This statement is defamatory *per se* and incapable of an innocent construction.

151.    It is an outright fabrication that Plaintiff drugged Defendant or had anything to do with her blacking out.

152.    The last time the parties saw each other in person was at the SCIENCE 101 show in New York City on June 10, 2022, which Defendant attended with her sister. By Defendant's own admission—while texting Plaintiff the next day—she left a gathering at a bar after the show without saying goodbye to anyone. Ex. 1.

153.    Defendant knew that she was making a false statement when she accused Plaintiff of causing her blackout.

22

154.    Defendant lied when she stated that she did not have a lot to drink that night. Witnesses who attended the social event saw Defendant drinking heavily.

155.    In communications with Plaintiff, Defendant frequently referred to herself as blacking out from drinking, including when playing drinking games.

156.    Defendant could not have truly been concerned about Plaintiff's alleged misconduct because after the alleged incident Defendant apologized for leaving without saying goodbye. Ex. 1. Defendant later called Plaintiff a "good friend." Ex. 2. She then compared Plaintiff to a shirtless stock model in another text message, which she believed was a compliment. Ex. 3.

157.    Defendant also lied in her message to Plaintiff's friend, telling her Plaintiff "has tried to come back to Chicago and immediately backs out when I tell him that he can't stay with me." Ex. 11.

158.    In truth, Defendant invited Plaintiff to stay at her apartment, in her guest room, when he planned to visit Chicago during a cross-country trip to Los Angeles.

159.    After Defendant sent Plaintiff a picture of a shirtless stock model on the cover of a romance novel, Plaintiff told Defendant he had changed his travel itinerary and would not be traveling to Chicago as planned.

160.    The exchange was friendly.

161.    Plaintiff did not go to Chicago due to a change in his route to Los Angeles. Attached hereto as Exhibit 12 are text messages discussing Plaintiff's October 2022 visit to Chicago.

162.    To make matters worse, Defendant again falsely accused Plaintiff of a "pattern of behavior." Ex. 11.

163.    A few days later, Defendant again messaged Plaintiff's friend, asserting the following false and defamatory statement about Plaintiff:

"Dustin Growick essentially groomed and sexually harassed me for several years."

Ex. 11.

164.    As detailed *supra* at Paragraphs 41-59, 71-74, 95-100, this statement is false, defamatory *per se*, incapable of an innocent construction and Defendant made this statement with actual malice.

165.    Defendant also stated "I wase recently put in touch with at least two other women and learned that he sexually assaulted one of them. We know that we aren't the only ones that he's done this to in some form or another." Ex. 11.

166.    Defendant did not identify the women referred to in this statement. However, Plaintiff has not engaged in any form of sexual misconduct, including sexual assault.

167.    To the extent that Defendant spoke to other individuals who accused Plaintiff of any form of sexual misconduct, those accusations are false.

168.    Given that Defendant was soliciting negative information about Plaintiff in order to destroy career—which was clearly stated in her Instagram stories—any person that came forward would also be biased and unreliable and, at the very least, Defendant acted in reckless disregard of the truth when relaying information about these women to other people.

169.    Defendant encouraged Plaintiff's friend to tell people about the accusations against Plaintiff and, belying her motive to destroy Plaintiff's career, Defendant said—in reference to the sexual assault allegations—"you're welcome to let people know that's why he vanished from social media last night." Ex. 11.

## VI. Plaintiff's Damages

170. As a direct result of Defendant's false and defamatory statements to Plaintiff's children's book publisher, the publisher cancelled the book publication and refused to work with him in the future.

171. As a direct result of Defendant's false and defamatory statements to the publisher of Plaintiff's adult book about dinosaurs, Plaintiff's publisher cancelled his contracts for publication of the book in the United States and Germany, causing Plaintiff to lose promised advances, plus royalties for peripheral materials for the book. Plaintiff also had an option with the publisher for his next book-length nonfiction work which was cancelled. The publisher will not work with Plaintiff again.

172. As a direct result of Defendant's false and defamatory statements to Plaintiff's literary agent, Plaintiff no longer has representation, which is critical to getting books published, particularly with Big Five publishers.

173. As admitted by Defendant, Plaintiff was forced to shut down his social media accounts due to her public smear campaign against him. Those accounts were a crucial source of business referrals and key to his publishing career and independent museum consulting work.

174. As a direct result of Defendant spreading false and defamatory statements about Plaintiff on social media and to Plaintiff's colleagues and friends in the science community, Plaintiff lost several business relationships, including: a virtual museum tour company; a museum and performing arts center at which he emceed events, and a company that sells scientific gifts.

175. In addition, Plaintiff's SCIENCE 101 show was cancelled by the venue at which it was hosted. Plaintiff has not been able to book SCIENCE 101 at any other venue or museum since Defendant engaged in her false and defamatory smear campaign.

176.    Plaintiff was also been dropped from a science-based volunteer program that he regularly participated in.

177.    As a direct result of Defendant's false and defamatory statements about Plaintiff, his reputation has been decimated in the science and museum community because he is reputed to be a sexual predator—which is absolutely and unequivocally false.

178.    Plaintiff is unable to work in his field and has been shunned by friends and colleagues who fear being associated with him due to Defendant's false accusations.

179.    As a result of the ostracization and complete upending of his life caused by Defendant's false and defamatory smear campaign, Plaintiff has also suffered severe emotional distress, including depression, anxiety, fear of being recognized by people aware of the false accusations, insomnia and panic attacks.

180.    Plaintiff has suffered damages in an amount to be determined at trial but not less than $1,000,000.

### COUNT I
### (Defamation)

181.    Plaintiff repeats and realleges each and every allegation set forth in Paragraphs 1-180 as if it is fully set forth herein.

182.    As fully detailed above, Defendant made the following false statements about Plaintiff:

  a.  Plaintiff co-opted work from the science communications community.

  b.  Plaintiff stole Defendant's work and failed to give her credit.

  c.  Plaintiff groomed Defendant.

  d.  Plaintiff drugged Defendant.

  e.  Plaintiff attempted to coerce Defendant into sexual activity.

    f.   Plaintiff sexually harassed Defendant.

    g.   Plaintiff is a sexual predator and pedophile.

    h.   Plaintiff admitted wrongdoing when—"out of the blue"—he expressed fear of being accused of sexual assault.

    i.   Plaintiff engaged in a pattern of sexual harassment and/or sexual assault.

    j.   Plaintiff sexually assaulted at least two other women.

183.    Defendant's statements are defamatory *per se*.

184.    None of Defendant's statements are capable of an innocent construction.

185.    Defendant's statements are not protected by any applicable privilege.

186.    Defendant acted with actual malice because, at the time she made the statements about Plaintiff she knew they were false or, at the very least, acted in reckless disregard of the truth or falsity of her statements.

187.    Defendant's statements are contradicted by her own conduct and communications with Plaintiff.

188.    Defendant also relied on biased and unreliable sources.

189.    Defendant had no evidence to support her false assertions that Plaintiff stole her work.

190.    Prior to making the false and defamatory statements that are the subject of this action, Defendant expressed a desire to destroy Plaintiff's reputation and career.

191.    In keeping with this intention, Defendant's false and defamatory smear campaign attacked Plaintiff from all angles, including Defendant directly contacting Plaintiff's two publishers and agent, waging a social media campaign and directly messaging Plaintiff's friends and colleagues.

192. As a direct and proximate result of Defendant's false and defamatory statements, Plaintiff suffered actual damages in an amount to be determined at trial, but not less than $1,000,000, including lost publishing contracts, cancelled business engagements, lost business opportunities, a loss of future earning capacity, reputational harm and severe emotional distress. Plaintiff's career as he knew it is has come to an end.

193. Plaintiff is also entitled to an award of punitive damages.

194. Because the harm resulting from Defendant's false and defamatory statements is continuing in nature, the damages sought herein will not provide Plaintiff with a complete remedy, Plaintiff also seeks an injunction directing Defendant to (i) take down all social media posts containing the statements outlined in Paragraph 182, including any social media posts referenced in this Complaint; (ii) publish a retraction of the statements referenced in Paragraph 182 to Defendant's social media accounts; (iii) provide Plaintiff with a signed retraction of the statements referenced in Paragraph 182 that can be used to mitigate the harm caused by Defendant's false and defamatory statements; (iv) refrain from publishing the statements referenced in Paragraph 182 in any form in the future.

WHEREFORE, Plaintiff Dustin Growick prays for judgment against Defendant Emily Ann a/k/a "Em" Meurer in an amount to be determined at trial but not less than $1,000,000, punitive damages, costs, and an injunction directing Defendant to (i) take down all social media posts containing the statements outlined in Paragraph 182, including any social media posts referenced in this Complaint; (ii) publish a retraction of the statements referenced in Paragraph 182 to Defendant's social media accounts; (iii) provide Plaintiff with a signed retraction of the statements referenced in Paragraph 182 that can be used to mitigate the harm caused by Defendant's false and defamatory statements; and (iv) refrain from publishing the statements

referenced in Paragraph 182 in any form in the future, and such other and further relief as the Court deems just and proper.

## COUNT II
### (False Light Invasion of Privacy)

195.     Plaintiff repeats and realleges each and every allegation set forth in Paragraphs 1-180 as if it is fully set forth herein.

196.     As a result of Defendant's publication of false statements about Plaintiff on her social media accounts and to her publishers, Plaintiff was placed in a false light before the public as a person who steals the research of people in underrecognized communities, takes advantage of women in the field of science and is a criminal, sexual predator who cannot safely be around children or young women.

197.     The negative connotations associated with Plaintiff as a result of Defendant's false statements would be highly offensive to a reasonable person.

198.     Defendant admittedly set out to destroy Plaintiff's reputation and career. She did this by publishing the following false statements about Plaintiff to her Instagram account, Plaintiff's book publishers and agent:

   a.    Plaintiff co-opted work from the science communications community.

   b.    Plaintiff stole Defendant's work and failed to give her credit.

   c.    Plaintiff groomed Defendant.

   d.    Plaintiff attempted to coerce Defendant into sexual activity.

   e.    Plaintiff sexually harassed Defendant.

   f.    Plaintiff is a sexual predator and pedophile.

   g. Plaintiff admitted wrongdoing when—"out of the blue"—he expressed fear of being accused of sexual assault.

      h.    Plaintiff engaged in a pattern of sexual harassment and/or sexual assault.

      i.    Plaintiff sexually assaulted at least two other women.

199.    Defendant acted with actual malice because, at the time she made the statements, she knew they were false or acted in reckless disregard of the truth or falsity of her statements.

200.    Defendant's statements are contradicted by her own conduct and communications with Plaintiff.

201.    Defendant relied on biased and unreliable sources.

202.    Defendant had no evidence to support her false assertions that Plaintiff stole her work.

203.    Prior to making the false statements that are the subject of this action, Defendant expressed a desire to destroy Plaintiff's reputation and career.

204.    In keeping with this intention, Defendant's false and defamatory smear campaign attacked Plaintiff from all angles, including Defendant directly contacting Plaintiff's two publishers and agent, waging a social media campaign and directly messaging Plaintiff's friends and colleagues.

205.    As a direct and proximate result of Defendant's false and defamatory statements, Plaintiff suffered actual damages in an amount to be determined at trial, but not less than $1,000,000, including lost publishing contracts, cancelled business engagements, lost business opportunities, a loss of future earning capacity, reputational harm and severe emotional distress. Plaintiff's career as he knew it is has come to an end.

206.    Plaintiff is also entitled to an award of punitive damages.

207.    Because the harm resulting from Defendant's false statements is continuing in nature, the damages sought herein will not provide Plaintiff with a complete remedy, Plaintiff also

seeks an injunction directing Defendant to (i) take down all social media posts containing the statements outlined in Paragraph 198, including any social media posts referenced in this Complaint; (ii) publish a retraction of the statements referenced in Paragraph 198 to Defendant's social media accounts; (iii) provide Plaintiff with a signed retraction of the statements referenced in Paragraph 198 that can be used to mitigate the harm caused by Defendant's false and defamatory statements; and (iv) refrain from publishing the statements referenced in Paragraph 198 in any form in the future.

WHEREFORE, Plaintiff Dustin Growick prays for judgment against Defendant, Emily Ann a/k/a "Em" Meurer in an amount to be determined at trial but not less than $1,000,000, punitive damages, costs, and an injunction directing Defendant to (i) take down all social media posts containing the statements outlined in Paragraph 198, including any social media posts referenced in this Complaint; (ii) publish a retraction of the statements referenced in Paragraph 198 to Defendant's social media accounts; (iii) provide Plaintiff with a signed retraction of the statements referenced in Paragraph 198 that can be used to mitigate the harm caused by Defendant's false and defamatory statements; and (iv) refrain from publishing the statements referenced in Paragraph 198 in any form in the future, and such other and further relief as the Court deems just and proper.

## COUNT III
### (Intentional Infliction of Emotional Distress)

208.    Plaintiff repeats and realleges each and every allegation set forth in Paragraphs 1-180 as if it is fully set forth herein.

209.    Defendant engaged in extreme and outrageous conduct by widely disseminating false accusations of research theft, drugging women, coercion, pedophilia, sexual predation, sexual assault and sexual harassment to Plaintiff's friends, colleagues, publishers and agent via social media and other means.

210.    Defendant's own conduct and communications, and the complete lack of evidence to support her false accusations render invalid any assertion by Defendant that her actions had a legitimate objective.

211.    Prior to disseminating the horrendous, false accusations about Plaintiff, Defendant admitted to her friend that she intended to destroy Plaintiff's reputation and career.

212.    Defendant, accordingly, intended to inflict severe emotional distress on Plaintiff or knew that there was a high probability that her conduct would cause severe emotional distress.

213.    As a result of the ostracization and complete upending of his life directly and proximately caused by Defendant's false accusations, Plaintiff suffered severe emotional distress, including depression, anxiety, fear of being recognized by people aware of the false accusations, insomnia and panic attacks.

214.    Plaintiff has suffered damages in an amount to be determined at trial but not less than $1,000,000.

215.    Plaintiff is also entitled to an award of punitive damages because Defendant acted with actual malice or, at the very least, in wanton disregard of Plaintiff's rights.

WHEREFORE, Plaintiff Dustin Growick prays for judgment against Defendant Emily Ann a/k/a "Em" Meurer in an amount to be determined at trial but not less than $1,000,000, punitive damages, costs, and for such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: February 17, 2025

Respectfully Submitted,

/s/ *Elvis D. Gonzalez*
Elvis D. Gonzalez (ARDC NO. 6280115)
ELVIS GONZALEZ, LTD.
233 South Wacker Drive
Chicago, IL 60606
(312) 558-9779
egonzalez@elvisgonzalezltd.com

-and-

Kara L. Gorycki (*pro hac vice* admission pending)
NESENOFF & MILTENBERG
363 Seventh Avenue, 5th Floor
New York, New York 10001
(212) 736-4500
kgorycki@nmllplaw.com